# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs December 14, 2011

## IN RE RONALD L. D.

**Appeal from the Juvenile Court for Roane County**
**No. 20442     Jeffery Hill Wicks, Judge**

_____

## No. E2011-01619-COA-R3-PT-FILED-JANUARY 25, 2012

_____

This is a termination of parental rights case in which the Tennessee Department of Children's Services (the "Department") removed Ronald L. D. (the "Child") from the custody of Ronald B. ("Father"). The Child was adjudicated dependent and neglected, and after Father failed to comply with the permanency plan, the Department petitioned to terminate Father's parental rights. Following a hearing, the court terminated Father's parental rights, finding that Father failed to substantially comply with two permanency plans, that the conditions which led to removal persisted, and that termination of Father's parental rights was in the best interest of the Child. Father appeals. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Julie Anne Foster, Oak Ridge, Tennessee, for the appellant, Ronald B.

Robert E. Cooper, Jr., Attorney General and Reporter, and Martha A. Campbell, Associate Deputy Attorney General, General Civil Division, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Darrell W. Sproles, Oak Ridge, Tennessee, guardian ad litem for the minor, Ronald L. D.

## OPINION

## I. BACKGROUND

The Child was born to Brenda D. ("Mother") and Father on October 12, 2002. Father and Mother were not married but lived together and cared for the Child. Mother died on January 26, 2008. Shortly before Mother's death, Father accepted employment as an "over-the-road" truck driver. His employment frequently required his absence from the family home, and in a typical month, Father would only be home for a few days. Following Mother's death, Father asked other individuals to care for the Child while he was working. On November 5, 2009, one such caregiver was arrested. The Department removed the Child, citing the fact that no suitable adults were present who could care for the Child. This was not the first time that Father had interacted with the Department. Prior to Mother's death, there had been allegations against Father of domestic violence and sexual abuse of the Child. There had also been an allegation that Mother had exposed the Child to drugs. However, an investigation determined that the allegations against Father were determined to be unfounded, and the Child was eventually returned to the home.

The Child has remained in foster care since being removed from Father's home in 2009. After the court issued an order placing the Child in the Department's custody, the Department provided a permanency plan providing for the return of the Child to Father. The plan, as ratified and modified by the trial court, instructed Father to

1. [E]nsure that [the Child's] physical emotional, and educational needs are met on a daily basis starting [November 25, 2009].
2. [P]rovide [the Department] with a list of supports who will provide for [the Child] when [he] is unavailable.
3. [C]omplete a [p]arenting class on appropriate parental decision making and on the responsibilities of being a parent by [February 28, 2010].
4. [N]ot leave [the Child] with anyone that cannot provide [the Child] with a safe, stable home and who is not considered appropriate to the court's standards starting [November 25, 2009].
5. [P]articipate in a mental health evaluation to address concerns regarding to past domestic violence and emotional instability and shall submit to random drug screens.
6. [P]articipate in in-home case management services provided to [the Child] regarding appropriate parenting and relationship building by [January 1, 2010].
7. [M]ake a decision [as to whether] he is able and willing to be the parent/caregiver to [the Child].
8. [P]ay $100.00 per month in child support unless and until the amount is modified by the Child Support Division of this Court. He shall

continue to pay child support in accordance with future child support orders.

In furtherance of the plan, the Department agreed to arrange visitation between the Child and Father, complete background checks on Father's suggested caregivers, complete home studies on Father's suggested caregivers, provide mental health counseling for the Child and Father, provide the Father with parenting classes, and arrange intensive in-home case management.

Shortly thereafter, the court adjudicated the Child dependent and neglected, finding that

[S]ince the death of [Mother], [Father] has left the [C]hild with at least [six] different caregivers while he is working as an over-the-road truck driver; the latest caregiver had outstanding warrants and was arrested[,] leaving the [C]hild with no parent or custodian; [Father] picked up the latest caregiver in Atlanta and after meeting with her for one hour, moved her into his home and left the [C]hild with her for periods of three weeks, all of which render the [C]hild dependent and neglected pursuant to [Tennessee Code Annotated section] 37-1-102(b)(12)(A) and (F).

The court found that the Department attempted to locate relatives for placement of the Child but that they were unable to find any relatives residing in Tennessee. The court further found that Father had not complied with the Department's permanency plan. At that time, Father had not completed the mental health evaluation, paid child support, or maintained regular visitation. The court directed Father to submit to the mental health evaluation and participate in therapeutic visitation with the Child and complete a corresponding bonding assessment. The court directed the Department to schedule the visitation and assessment and investigate Dianne B. and Amber B., Father's suggested caregivers.

Following Father's continued failure to adhere to the permanency plan, the Department filed a petition to terminate Father's parental rights on October 12, 2010. The grounds asserted for termination were abandonment for failure to pay child support, substantial noncompliance with the obligations of the permanency plan, and failure to remedy the conditions which led to the removal of the Child.

Approximately one month later, the Department entered a second permanency plan that added the goal of adoption to establish permanency for the Child. The plan, as ratified by the trial court, required Father to

-3-

1. [A]rrange visitation [] through the [Department] and will ensure that he is visiting on a regular and consistent basis.
2. [P]rovide a list of alternative placements for [the Child].
3. [M]ake a decision [as to whether] he is able and willing to be the parent/caregiver to [the Child].
4. [P]rovide a safe, stable home to [the Child] whether through himself or an[] approved caretaker.
5. [P]ay $100.00 per month in child support.
6. [P]articipate in a mental health evaluation to address concerns regarding to past domestic violence, emotional instability, alcohol/drug.

Father was not in agreement with the plan because he did not agree with the goal of adoption.

At the trial on the petition to terminate Father's parental rights, the Department removed the ground of abandonment, admitting that child support payments had been withheld from Father's paycheck through the relevant time period. The case proceeded on the grounds of Father's substantial noncompliance with the permanency plan and the persistence of conditions that led to the Child's removal.

Father admitted that once he accepted employment as an over-the-road truck driver, he realized that it would be difficult to find someone to care for the Child while he was working. He stated that he was usually gone for two weeks at a time before returning home for approximately three days. In the summer, he was able to take the Child with him on his trips. He testified that he had been "staying out a lot longer" since the Child had been placed in foster care. He said that when Mother died, his mother ("Grandmother") took the Child to California to stay with her. When the Child returned, he entrusted several different people to provide for the Child in his absence. He recalled that most of the caregivers moved into the home to care for the Child. He related that although the caregivers periodically changed, the arrangement in which others would care for the Child in his absence persisted for approximately two years. He explained that he had hired so many different caregivers because he had to "throw a few out." He claimed that he threw some out because he did not like the way they had been treating the Child and that he threw others out because they caused damage to the house.

Relative to the most recent caregiver, Pamela Moore, Father said that he met Ms. Moore through a friend that was also an over-the road truck driver. His friend told him that Ms. Moore "could use a hand up and need[ed] a home." He related that he met Ms. Moore in Atlanta and had dinner with her and that because "[s]he seemed like a nice enough lady," he brought her to the house. He testified that he asked her about her criminal past and that she denied that she had any outstanding warrants for her arrest. He spent approximately one

week at home with Ms. Moore and the Child before returning to work. He said that Ms. Moore had been caring for the Child for approximately three months before the Child was removed.

Relative to his compliance with the requirements contained in the permanency plans, Father said that his attorney did not review the permanency plan with him and that the Department did not explain the requirements of the plan to him. He admitted that he met with workers from the Department at McDonald's when he was given the plan. Despite the lack of guidance, he completed the mental health assessment and identified his estranged wife, Dianne B. ("Ms. B."), and their daughter, Amber B., as suitable caregivers. He testified that he and Ms. B. had been separated for approximately 15 years but that she was willing to care for the Child in his absence. He said that he suggested Grandmother as a suitable caregiver but claimed that the Department rejected the idea because she lived in a different state. While he completed the mental health assessment, he did not continue with individual therapy as recommended because he did not believe the court had ordered him to complete therapy. When asked whether he was released from therapy, he stated, "It doesn't matter. I released myself." Likewise, he did not see a need to comply with the drug screens because his employment required random drug screening.[1] Regarding his employment, he attempted to find other employment when the Child was removed from his custody, but he had not searched for a job in the past year. He stated that if he quit his job, he did not know how he would provide for the Child or if he would be able to pay child support as required. He testified that he had arranged with his employer to attend parenting classes each week for six weeks but that he did not complete the program because he would not be able to visit with the Child on those days. When asked why he did not complete the requirements when he was unemployed for approximately two months, he said, "Because as far as I'm concerned, I hadn't committed a crime."

When asked whether he had ever left the Child with an inappropriate caregiver, Father stated,

> Well, maybe from like some other people's point of view. But, no. I've been
> on the streets myself when I was a child. And I just don't feel like helping
> people is the wrong thing to do.

He insisted that he would never knowingly place the Child with someone who could be characterized as an inappropriate caregiver. He believed that it was important to maintain a relationship with the Child and that he missed and loved the Child. When asked why he did not quit his job in order to allow him to spend more time with the Child, Father stated,

---

[1] He insisted that he passed a drug test one week prior to the trial.

"Why would I quit my job to prove I love my kid to you?" He further stated, "I don't want to go back to working for $6 an hour."

Jessica Howard, the Department's case manager in charge of Father's case,[2] testified that she encouraged Father to meet with the Department to develop the permanency plan together. When Father refused to come to the office, she and her supervisor, Rick Miller, met with him at McDonald's. At the restaurant, they "explained what the steps were" and "what [they] were asking" him to change. Father refused to sign the form but was given a copy to take to his attorney. Approximately four months later, she went to Father's home and met with Father, Ms. B., and Amber B. She told Father that he needed to complete parenting classes. Approximately seven months later, she met with Father at her office, where they developed the second permanency plan along with the Foothills worker, Tonya Blackburn. At that point, Father had completed his mental health assessment at Ridgeview but had not signed a release allowing the Department to view the results. Father had also not completed the parenting classes or provided proof that he had attended individual counseling. She gave him a brochure and other information about free parenting classes. Ms. Blackburn took Father to Ridgeview so that Father could sign a release form allowing the Department to view the mental health assessment.

Ms. Howard opined that while Father had been given the necessary resources to complete the permanency plan, she had not been able to meet with him on a regular basis. She explained that Father was "always gone" and was only home "two or three days out of the month." She recalled that she repeatedly told Father that the "biggest concern" with his case was that he was not physically or emotionally "available" for the Child because of his extended absences.

Relative to Father's suggested caregiver, Ms. Howard testified that she spoke with Ms. B. and completed a background check on her. She found Ms. B. to be "one of the sweetest ladies" she had ever met. She said that Ms. B. was uncomfortable talking about personal issues in front of Father and that she told Ms. B. to contact her for a private appointment and to also contact the foster parents to arrange visitation with the Child. However, Ms. B. never contacted her or the foster parents and "never showed interest in wanting to be a caretaker for [the Child]." Ms. B. told her that she would care for the Child if the Child came home to Father but that "she didn't feel comfortable overstepping her boundaries and getting in [Father's] business." Additionally, Amber B. expressed a desire to return to California. Relative to Grandmother, Ms. Howard said that Father never identified Grandmother as a possible caregiver. She recalled that she had been told that Grandmother lived in California. She related that if Father had suggested Grandmother as

---

[2]Ms. Howard had been promoted to foster care supervisor by the time of the trial.

an option prior to trial, she could have contacted officials in California and asked them to complete a home study. She admitted that the Department did not identify a nanny service for Father to investigate as an option but explained that she encouraged Father to look for suitable caregivers in reputable places instead of at restaurants and truck stops.

Relative to Father's visitation with the Child, Ms. Howard testified that the Child exhibited troubling behaviors and threatened to harm himself following visitation with Father. Specifically, the Child suffered from enuresis[3] and encopresis[4] following visitation with Father. She explained that the Child had developed reactive attachment disorder, which ordinarily occurs when children have a lot of different caregivers. She referred the case to Foothills to arrange therapeutic visitation with the Child. She related that Ms. Blackburn reported that the supervised visits went well and that Father acted appropriately. Shortly before trial, the court ordered that visitation between the Child and Father should cease. She stated that once visitation with Father ceased, the Child showed no signs of enuresis or encopresis, was not "getting in trouble at school," and was not "threatening to harm himself."

Ms. Howard testified that the Child had been staying with the foster parents for approximately a year and a half prior to trial. She said that she visited with the Child at least twice a month, with at least one home visit each month. She opined that the Child interacted well with the foster parents and that the foster parents had established rules for the Child and provided the Child with a "very consistent routine schedule." She recalled that the Child had opened up to his foster father and had begun to create a bond with the foster father. She claimed that the foster parents had even expressed a desire to adopt the Child. She related that the Child competed for attention with the other two foster children. She believed that the Child was jealous because the other two foster children spent more time with their biological father, while the Child only visited with Father once a month for a few hours. She said that the foster parents had alleviated the Child's need for attention by providing the Child with frequent "one-on-one" time with them.

Following the presentation of the above evidence, the trial court found that there was clear and convincing evidence to establish that Father had not complied with either permanency plan and that a ground for termination existed pursuant to Tennessee Code Annotated section 36-1-113(g)(2). The court held that while Father "knew that his parental

---

[3]This condition is defined as the "involuntary discharge of urine." Merriam-Webster Online Dictionary (2012) (www.merriam-webster.com (derived from Merriam-Webster's Collegiate Dictionary (11th Ed.))).

[4]This condition is defined as the "involuntary passage of feces" that develops "as a consequence of chronic constipation." Merriam-Webster Online Dictionary (2012) (www.merriam-webster.com (derived from Merriam-Webster's Collegiate Dictionary (11th Ed.)))

rights could be terminated for failing to comply with the permanency plans," Father "failed to comply with any of the requirements of the plans, despite having eighteen (18) months to do so." The court noted that the Child had been removed from the home for a period of 18 months, that the conditions which led to the removal persisted, that there was little likelihood that the conditions would be remedied, and that the continuation of the Child's relationship with Father would greatly diminish the Child's chances of early integration into a safe and stable home, thereby establishing a second ground for termination pursuant to Tennessee Code Annotated section 36-1-113(g)(3). In finding evidence to support the second ground, the court acknowledged that Father testified that he would quit his job. However, the court stated,

> Well, actions speak louder than words. You've had [18] months to quit your job. And all you had to do is attend some parenting classes, and mental health assessment, and follow any recommendations, and you would have had [the Child] back.

In the written order, the court stated,

> Due to [Father's] willful decisions, the [C]hild cannot be returned to his custody because, as was true at the time of the removal of the [C]hild, [Father] is not available to care for the [C]hild and there are no other appropriate persons to do so on the [F]ather's behalf while he is on the road.

The court further found that termination of Father's parental rights was in the best interest of the Child when Father, despite the Department's reasonable efforts to assist in him reuniting with the Child, had not "made changes to his conduct, circumstances, or lifestyle that would make it safe for the [C]hild to return home." This timely appeal followed.

## II. ISSUES

We consolidate and restate Father's issues on appeal as follows:

A. Whether there was clear and convincing evidence to establish that Father failed to substantially comply with the obligations of the permanency plans.

B. Whether there was clear and convincing evidence to establish that Father failed to remedy the conditions resulting in the removal of the Child.

C. Whether there was clear and convincing evidence to establish that the Department used reasonable efforts to assist Father in achieving the goals of the permanency plans.

D. Whether there was clear and convincing evidence to establish that termination of Father's parental rights was in the best interest of the Child.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child."

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Aubrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004).
>
> Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).

## IV. DISCUSSION

As a threshold matter, we must address Father's claim that there was insufficient evidence to support the court's initial dependency and neglect finding when the Child was

-10-

removed from his care. Father asserts that his error in choosing Ms. Moore as a caregiver for the Child was not "a fatal failure on his part to ensure the safe and stable upbringing of [the Child]." As Father recognizes in his brief, these assertions are without merit because any violations of due process rights that may have occurred at the dependency and neglect proceeding were fully remedied by the procedural protections provided at the termination trial. *In re S.Y.*, 121 S.W.3d 358, 365 (Tenn. Ct. App. 2003) (citing *In re Hoover Crawford*, No. M2000-01655-COA-R3-CV, 2001 WL 846044 (Tenn. Ct. App. July 27, 2001)).

In addition to the above argument, Father contends that the termination grounds found by the trial court - substantial non-compliance with the permanency plan and persistent conditions - were not established by clear and convincing evidence. Father also asserts that the Department did not make reasonable efforts to reunite the Child with him and that termination of his parental rights was not in the best interest of the Child. We will address each issue in turn.

A.

Father asserts that he substantially complied with the requirements contained in the permanency plans. The Department responds that the requirements contained in the permanency plans were reasonable and that termination of Father's parental rights was warranted because Father failed to substantially comply with the requirements.

Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal. Tenn. Code Ann. § 37-2-403(a)(2)(A). A ground for termination of parental rights exists when a petitioner proves by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan . . . ." Tenn. Code Ann. § 36-1-113(g)(2).

To establish noncompliance, the trial court must initially find "that the requirements of the permanency plans are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656; *see In re Valentine*, 79 S.W.3d at 547. When the trial court does not make such findings, the appellate court should review the issue de novo. *In re Valentine*, 79 S.W.3d at 547. Second, the court must find that the parent's noncompliance is substantial, *In re M.J.B.*, 140 S.W.3d at 656, meaning that the parent must be in "noncompliance with requirements in a permanency plan that are reasonable and related to remedying the conditions that warranted removing the child from the parent's custody." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). To assess a parent's substantial noncompliance with a permanency plan, the court must weigh

-11-

"both the degree of noncompliance and the weight assigned to that particular requirement." *In re Z.J.S.*, 2003 WL 21266854, at \*12. Conversely, "[t]erms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *In re Valentine*, 79 S.W.3d at 548-49.

Here, Father was tasked with completing a mental health assessment and following recommendations from that assessment, completing parenting classes, submitting to random drug screens, paying child support, and providing a safe and stable home for the Child by either identifying a suitable caregiver to provide for the Child in his absence or finding other suitable employment that did not require his extended absence from the home. We believe that these requirements were reasonable and related to remedying the conditions that led to the Child's removal from the home. However, Father simply failed to substantially comply with these requirements.

Father did not attend parenting classes, submit to random drug screens, or follow the recommendations from the mental health assessment. Most importantly, he did not remedy the condition that led to the Child's removal, namely to provide a safe and stable home for the Child. Father had not searched for alternative employment in over a year, and his suggested caregiver was rejected by the Department. Father argues that he should not be penalized for his career choices. We recognize Father's desire to maintain stable employment; however, his employment as an over-the-road truck driver did not allow him to adequately care for the Child, who had been left with several different people in Father's absence. Additionally, Father was given an adequate opportunity in which to name a stable and suitable caregiver for the Child if he wished to maintain his employment as a truck driver. When Ms. B. was rejected as a suitable caregiver, Father should have attempted to either name a new caregiver or find employment that would allow him to adequately care for the Child. His suggestion of Grandmother as a suitable caregiver and his offer to quit his job were untimely and unavailing because Father had been given adequate time in which to fulfill the requirements in the plan prior to trial. Father simply chose to ignore the permanency plan requirements instead of remedying the conditions which led to the Child's removal. Accordingly, we conclude that while Father attempted to comply with some of the requirements enumerated in the permanency plan, the trial court's finding that Father was in substantial noncompliance with the permanency plan is supported by clear and convincing evidence. Thus, a statutory ground existed for termination of Father's parental rights.

B.

Father asserts that the trial court erred in terminating his parental rights based upon the ground of persistent conditions. Father contends that the court should not have "punishe[d] a parent for being gainfully employed" and that the grounds which led to

removal did not persist. The Department responds that termination of Father's parental rights was appropriate because the conditions that led to removal persisted. The Department asserts that despite having a year and a half to remedy the conditions that led to removal, Father refused to find other employment and failed to identify a suitable person to care for the Child in his absence.

Under Tennessee law, a court may terminate parental rights when:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3). Termination of parental rights requires clear and convincing evidence of all three factors noted above. *In re Valentine*, 79 S.W.3d at 550. In the instant case, the Child had been removed from Father's care and residing in foster care for approximately 18 months by the time of the trial. Additionally, the Child had been adjudicated dependent and neglected for approximately one year.

We sympathize with Father's situation; however, leaving the Child with random people for weeks at a time posed a substantial danger to the Child and could have eventually resulted in the physical or sexual abuse of the Child or even the Child's death. Father's own trial testimony indicated that the conditions that led to removal had not changed and that there was little likelihood that the conditions would be remedied. Indeed, Father was stubborn in his refusal to remedy the conditions. Father had not searched for a job in over a year, and after Ms. B. was rejected as a suitable caregiver, he did not suggest any additional caregivers or make any effort to provide a stable home for the Child. While Father was focused on his job, the Child had been placed in a safe, stable, and permanent home, where

-13-

the Child was thriving with foster parents who wished to adopt the Child. Accordingly, we conclude that clear and convincing evidence was presented that the conditions that resulted in the Child's removal from Father's custody have persisted more than six months after the Child was removed, that the conditions are not likely to be remedied in the near future, and that continuation of the parent-child relationship here would present an obstacle to the Child's integration into a safe, stable, and permanent home. Therefore, we conclude that the evidence does not preponderate against the trial court's finding that persistent conditions were established by clear and convincing evidence and that a second statutory ground existed for termination of Father's parental rights.

C.

Father argues that the Department did not make reasonable efforts to help him accomplish the goals provided in the permanency plans. The Department responds that reasonable efforts were made to facilitate Father's compliance with the permanency plans.

Once a child has been removed from a parent's home, the Department is tasked with making it possible for the child to return home before instituting termination proceedings. Tenn. Code Ann. § 37-1-166(a)(2). At the termination proceeding, the Department must prove by clear and convincing evidence that reasonable efforts were made to reunite the child with the parent. Tenn. Code Ann. § 37-1-166(b). For purposes of the Department's involvement, the term reasonable efforts refers to "the exercise of reasonable care and diligence by the [D]epartment to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). "The reasonableness of the Department's efforts depends upon the circumstances of the particular case." *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006).

"While the Department's reunification efforts need not be "herculean," the Department must do more than simply provide the parents with a list of services and send them on their way." *Id.* "The Department's employees must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan." *Id.* These "employees have an affirmative duty to utilize their education and training to assist parents in a reasonable way to address the conditions that led to the child's removal and to complete the tasks stated in the plan." *In re R.L.F.*, 278 S.W.3d 305, 316 (Tenn. Ct. App. 2008). In keeping with this ideal, the Department must provide an affidavit, identifying its reasonable efforts, for the court's consideration. Tenn. Code Ann. § 37-1-166(c); *see In re R.L.F.*, 278 S.W.3d at 317. In determining whether the efforts used by the Department were reasonable, the court should consider the Department's affidavit and the following factors:

-14-

(1) the reasons for separating the parent from his or her children,

(2) the parent's physical and mental abilities,

(3) the resources available to the parent,

(4) the parent's efforts to remedy the conditions that required the removal of the children,

(5) the resources available to the Department,

(6) the duration and extent of the parent's remedial efforts,

(7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Giorgianna H.*, 205 S.W.3d at 519. However, "'[r]eunification of a family is a two-way street, and the law does not require [the Department] to carry the entire burden of this goal." *State Dept. of Children's Services v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006) (quoting *In re R.C.V.*, No. W2001-02102-COA-R3-JV, 2002 WL 31730899, at *11 (Tenn. Ct. App. Nov. 18, 2002)). "Thus, parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519.

The permanency plans at issue in this case were not lengthy or hard to follow, and the conditions that led to removal could have been easily remedied. In the affidavit of reasonable efforts, Ms. Howard certified that Father had been provided with resources to access a mental health evaluation and parenting classes and had arranged therapeutic visitation between Father and the Child. Additionally, Ms. Howard interviewed Ms. B. and completed a background check on Ms. B. We believe that Ms. Howard took great measures to meet with Father and explain the steps of each permanency plan but that Father simply failed to follow her advice and take advantage of all of the resources that were offered to him. Indeed, Father complied with some requirements but refused to comply with the requirements that he felt were unnecessary. Accordingly, we conclude that the record contains clear and convincing evidence that the Department made reasonable efforts to assist Father in his attempts to reunite with the Child.

D.

Having concluded that there was clear and convincing evidence supporting each of the statutory grounds to terminate Father's parental rights and that the Department made reasonable efforts to assist Father, we must consider whether it was in the best interest of the Child to terminate Father's parental rights. In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

In this case, a number of the best interest factors weigh against Father. Despite repeated warnings and suggestions that his employment circumstances hindered his ability to provide the Child with a stable and safe home, Father refused to make the changes necessary to adequately care for the Child. Tenn. Code Ann. § 36-1-113(i)(1), (2). Father's inability to visit with the Child more than once a month for a few hours has damaged the relationship between Father and the Child and resulted in the Child's exhibition of behavioral problems following the sporadic visits with Father. Tenn. Code Ann. § 36-1-113(i)(3), (4). Additionally, the Child presently resides in a safe and stable foster home with foster parents that expressed a desire to adopt the Child. Removing the Child from the foster parents and returning the Child to Father would traumatize the Child. Tenn. Code Ann. § 36-1-113(i)(5). Questions remain as to whether the physical environment of Father's home is healthy and safe because Father has not agreed to either care for the Child on his own or present a suitable caregiver to provide for the Child when Father is absent. Tenn. Code Ann. § 36-1-113(i)(7). Testimony was presented that Father left the Child for extended periods of time with a woman that Father had just recently met. Father's testimony at trial suggested that he did not find his behavior inappropriate and that his behavior and lack of concern for the Child in his absence would likely continue.

We do not wish to discount Father's purported desire to help those in need as evidenced by his hiring of Ms. Moore. However, Father's concern for the Child's safety should have been paramount. Father's refusal to acknowledge his questionable judgment is troublesome, and his refusal to remedy the conditions that led to removal provided grounds for termination of his parental rights. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Father's parental rights was in the best interest of the Child. Accordingly, we affirm the decision of the trial court.

## V.  CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary.  Costs of the appeal are taxed to the appellant, Ronald B.

_____
JOHN W. McCLARTY, JUDGE